# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TAMER HASSANEIN,<br><br>    Plaintiff,<br><br>    v.<br><br>NTO FUND I, NICHOLA ELIOVITS,<br>and DERMBIONT, INC.,<br><br>    Defendants. | C.A. No. 2025–0299–DH |

## OPINION DENYING RULE 12(B)(6) MOTIONS TO DISMISS

Date Submitted: July 8, 2026
Date Decided: August 4, 2026

David E. Wilks, D. Charles Vavala, Jordan Hicks, WILKS LAW, LLC, Wilmington, Delaware; *Attorneys for Plaintiff Tamer Hassanein.*

Elizabeth S. Fenton, Brittany M. Giusini, BARNES & THORNBURG LLP, Wilmington, Delaware; *Attorneys for Defendants NTO Fund I, LLC, Nichola Eliovits, and DermBiont Inc.*

**LASTER, V.C.**

A co-founder needed a short-term loan of around $2 million to fund his business. He planned to repay it in six months.

His friend agreed to provide the loan. Five years later, the friend still has not been repaid. In this action, the friend seeks to recover his money.

The matter is complicated because the friend did not loan the money directly to the co-founder or his business. Instead, the friend loaned the money to a newly created, special-purpose vehicle that took the form of a manager-managed limited liability company (the "Company"). Its LLC agreement designated the co-founder as its sole manager.

The Company's LLC agreement identified a date six months later as the "Maturity Date" and required that the co-founder make a capital contribution to the Company—on or before the Maturity Date—in an amount sufficient to repay the loan. The LLC agreement required the Company to use the co-founder's capital contribution to repay the loan.

The co-founder never made the required capital contribution, and the Company never repaid the loan. Four years later, the friend gave notice that the loan was past due and demanded repayment. The Company still did not pay.

The friend filed this lawsuit. He claimed breach of the LLC agreement by the Company for failing to repay the loan. He claimed breach of the LLC agreement by the co-founder for failing to make the capital contribution that would have enabled the Company to repay the loan. He also sued under a section of the Delaware Limited

Liability Company Act (the "LLC Act") that authorizes a creditor to enforce a member's obligation to make a capital contribution.

The Company and the co-founder moved to dismiss the complaint under Rule 12(b)(6). This opinion denies their motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the currently operative pleading and the documents it incorporates by reference. At this stage of the case, the complaint's well-pled allegations are taken as true, and the plaintiff receives the benefit of all reasonable inferences.[1]

### A.     The Loan

In 2021, DermBiont, Inc. needed capital. Nichola Eliovits co-founded DermBiont and was one of its principals.

Eliovits asked his friend Tamer Hassanein for a six-month loan. His friend agreed.

For reasons that remain unclear at the pleading stage, Eliovits and Hassanein did not paper a loan between themselves. Nor did they paper a loan between Hassanein and DermBiont. Instead, they formed the Company, formally known as NTO Fund I, LLC, to act as a financial intermediary.

As they envisioned the deal, Eliovits and Hassanein would each own half of the Company. Hassanein would loan money to the Company, which would invest the

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the verified amended complaint, which is the operative pleading. Dkt. 13. Citations in the form "Ex. ___ at ___" refer to exhibits to the complaint. *Id.*

money in DermBiont. In return, DermBiont would issue the Company an equity stake.

Hassanein's loan would mature and become due after six months. Before the due date, Eliovits would make a capital contribution to the Company that would enable the Company to repay the loan. No interest would accrue on the loan during the first six months. After six months, simple interest would accrue at 6% per annum.

In the end, Eliovits and Hassanein would own stakes in the Company, which would own equity in DermBiont. As a matter of economic substance, Eliovits would have contributed additional capital to DermBiont, but Hassanein would have facilitated the contribution by fronting the capital and being repaid. For his trouble, Hassanein would end up co-owning an indirect interest in DermBiont, held through the Company.

## B. The LLC Agreement

Eliovits and Hassanein memorialized their deal in the Company's LLC agreement (the "LLC Agreement").[2] The LLC Agreement has the look and feel of a document drafted without lawyer input, and it contains many inconsistencies.[3]

---

[2] Ex. A (cited as "LLCA").

[3] One of the LLC Agreement's awkward conventions involves framing terms like the Class B Loan, the Class B Member, and the Class A Member (each defined below) in the plural. There is but one Class B Loan, one Class B Member, and one Class A Member. When quoting the LLC Agreement, this decision replaces the plural terms with singular versions. For legibility, the decision does not include brackets in the quotations to reflect those minor edits.

3

The LLC Agreement documented Eliovits' ownership of 300,000 uncertificated Class A Units and his status as the sole Class A Member. The LLC Agreement documented Hassanein's ownership of 300,000 uncertificated Class B Units and his status as the sole Class B Member. The LLC Agreement provided that the units would receive their "Pro Rata Share" of any distribution but defined that term in a non-pro-rata manner to mean 75% to the Class A Member and 25% to the Class B Member.[4]

The LLC Agreement created a manager-managed governance structure. Eliovits was the sole manager, giving him control over the Company's business and affairs.[5] The LLC Agreement nominally provided for the units to have "identical voting rights,"[6] but it cemented Eliovits's control by providing that the manager only could be removed for cause and only by the vote of the Class A Units.[7]

The LLC Agreement recited that Eliovits and Hassanein each made an initial capital contribution to the Company of $100.[8] Each member also had to make an additional capital contribution.

---

[4] LLCA, art. I (definition of "Pro Rata Share").

[5] *Id*. § 6.1(a).

[6] *Id*. § 3.1.

[7] *Id*. § 6.2(b)

[8] *Id.* § 3.1(b) ("The Members agree that each of the Members has made the initial capital contributions to the Company in the amount set forth opposite each member's name in Exhibit A."). The LLC Agreement also provided that "[e]ach Member hereby covenants and agrees to make an initial capital contribution to the Company in exchange for the issuance of Units." *Id.* § 3.1(f). Those sections treat the

4

The LLC Agreement recited that Hassanein had made an additional contribution in the form of a loan to the Company in the amount of $1,924,417.78 (the "Class B Loan").[9] The LLC Agreement specified the "Maturity Date" for the loan as a date six months after funding. If the Company did not repay the Class B Loan by the Maturity Date, then simple interest would accrue at a rate of 6% per annum on the unpaid amount.[10]

The LLC Agreement required that the holder of the Class A Units—namely Eliovits—make a capital contribution on or before the Maturity Date in an amount sufficient to repay the Class B Loan plus any accrued interest (the "Contribution

---

initial contributions differently. The first treats them as already having been made. The second treats them as obligations to be fulfilled.

[9] *Id.* § 3.1(e)(ii) & Ex. A. Those sections treat the Class B Loan differently in the same way that the LLC Agreement treats the initial contributions differently. Exhibit A to the LLC Agreement identifies Hassanein as an existing member, recites the "Amount of Initial Capital Contribution" as "$100 plus $1,924,417.78 of Class B Loans [sic]," and identifies his "Number and Class of Units" as "300,000 Class B." *Id.* Ex. A. Under that framing, Hassanein has already contributed both $100 and the Class B Loan in return for the Class B Units that make him the Class B Member. Section 3.1(e)(ii) frames the Class B Loan as an obligation "of the Class B Units" to be made by the "Class B Member." *Id.* § 3.1(e)(ii). Under that framing, Hassanein already has his units and is the Class B Member, but he still has an obligation to make the Class B Loan.

[10] *Id.* § 3.1(e)(ii).

5

Requirement").[11] The LLC Agreement required that the Company use the capital contribution to repay the Class B Loan (the "Repayment Obligation").[12]

## C.    The Company Fails To Repay The Class B Loan.

On September 21, 2021, Hassanein loaned $1,924,417.78 to the Company. Eliovits instructed Hassanein to send the money directly to DermBiont rather than to the Company, so he did.

The Maturity Date was therefore March 21, 2022. The Contribution Requirement mandated that Eliovits make a capital contribution sufficient to repay the Class B Loan by the Maturity Date.

Eliovits did not make the required capital contribution by the Maturity Date. The Contribution Requirement is mandatory and unconditional. By failing to satisfy it, Eliovits breached the Contribution Requirement.

The Company did not repay the Class B Loan on the Maturity Date. Beginning on the Maturity Date, the Class B Loan started accruing simple interest at 6% per annum.

Since the Maturity Date, Eliovits still has not satisfied the Contribution Requirement. Instead, he has made sporadic payments on the Class B Loan directly to Hassanein.

---

[11] *Id.* § 3.1(d)(ii).

[12] *Id.* § 3.2 ("Immediately upon receipt of the capital contributions from the Class A Member under Section 3(d)(ii), the Company shall use those amounts to repay to the Class B Member the Class B Loan").

**D.     This Litigation**

On March 9, 2025, four years after making the Class B Loan, Hassanein demanded full repayment from the Company. When the Company did not comply, Hassanein filed this lawsuit. As of July 21, 2025, the date of the operative complaint, the amount due on the Class B Loan was $1,728,976.30.

The complaint contains four counts.

- Count I asserts a claim for breach of the LLC Agreement against the Company based on its failure to fulfill the Repayment Obligation by satisfying the Class B Loan on or before the Maturity Date.

- Count II asserts a claim for breach of the LLC Agreement against Eliovits based on his failure to satisfy the Contribution Requirement on or before the Maturity Date.

- Count III asserts a claim under Section 18-502 of the LLC Act against Eliovits based on his failure to satisfy the Contribution Requirement on or before the Maturity Date.

- Count IV asserts a claim for unjust enrichment against DermBiont.

The defendants moved to dismiss the complaint in its entirety.

The case was assigned to a magistrate judge, who issued a report recommending dismissal of all four counts.[13] Hassanein noticed exceptions to the recommendations on Counts I, II, and III. He did not notice an exception to the recommended dismissal of Count IV. As a result, the dismissal of Count IV became an order of the court, and DermBiont is no longer a party to the case.

---

[13] *Hassanein v. NTO Fund I, LLC (Report)*, 2026 WL 206873 (Del. Ch. Jan. 27, 2026).

## II. STANDARD OF REVIEW

When a party takes exceptions to a magistrate judge's report, a constitutional judicial officer must review the matter de novo.[14] This decision addresses de novo the Company's motion to dismiss Count I and Eliovits's motion to dismiss Counts II and III.

For the reasons that follow, this decision must disagree with the magistrate judge's recommendation, which is not adopted as an order of the court. The motions to dismiss are denied. All three counts can proceed past the pleading stage.

## III. LEGAL ANALYSIS

The Company and Eliovits moved to dismiss the counts against them under Rule 12(b)(6). That motion tests whether the complaint states a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pled factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pled' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[15] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[16] "Our governing

---

[14] *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[15] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[16] *Id*.

'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[17]

## A. Count I: The Claim Against The Company For Breach Of The LLC Agreement

Count I asserts that the Company breached the LLC Agreement by failing to fulfill the Repayment Obligation by repaying the Class B Loan on or before the Maturity Date. Count I states a claim on which relief can be granted.[18]

### 1. Governing Principles of Law

Count I asserts a claim for breach of the LLC Agreement. Delaware decisions frequently describe LLCs as "creatures of contract,"[19] but that overstates matters. In

---

[17] *Id.* at 537 n.13.

[18] I do not believe that this decision addresses any issues *sua sponte*, but it does go into greater detail than the parties' briefs and cites authorities they did not reference. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). To that end, this section of the decision elaborates *sua sponte* on two issues. The first involves the reasons why LLCs are primarily creates of contract rather than purely creatures of contract. I have previously summarized those reasons, but I have not previously taken the time to list them. Both the defendants and the magistrate judge relied heavily on the "creatures of contract" concept, so I thought it helpful to elaborate. The second is the distinction between contributing capital in return for equity, on the one hand, and making a loan to an entity, on the other. Although the parties advance more abstract arguments based on the language of the LLC Agreement, that foundational distinction lies at the heart of the case. It is also important to recognize that some forms of debt, like the Class B Loan in this case, carry advantageous terms that imply a bundled equity contribution.

[19] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *accord, e.g., Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Touch*

9

reality, LLCs are *primarily* creatures of contract,[20] and the adverb "primarily" should not be overlooked. There are "core attributes of the LLC" that are not contractual and which "only the sovereign can authorize."[21] An LLC agreement cannot be an exclusively private contract among its members "precisely because the LLC has powers that only the State of Delaware can confer."[22] And whatever one's views might historically have been on whether the LLC Act took a purely contractual approach,

---

*of It. Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at \*4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract . . . ."); *see Fisk Ventures LLC v. Segal*, 2008 WL 1961156, at \*8 (Del. Ch. May 7, 2008) ("In the context of limited liability companies, which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC agreement or some other contract." (footnote omitted)). The Report cited the "creatures of contract" formulation. Report at \*2.

[20] *See In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract . . .").

[21] *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605–06 (Del. Ch. 2015); *see* 6 *Del. C.* §§ 18-201, 18-303.

[22] *Carlisle*, 114 A.3d at 606; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659–63 (Del. Ch. 2012); *Auriga Cap.* Corp. *v. Gatz Props., LLC*, 40 A.3d 839, 849–56 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012). Scholars have explained why LLCs are not purely creatures of contract. *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460–71 (2009) (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315–24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach).

the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with that view.[23]

There are at least a score of reasons why LLCs are not wholly contractual and are primarily creatures of contract.[24] They include:

- Requiring as a condition to the formation of an LLC agreement that the parties establish an LLC through a filing with the Delaware Secretary of State and the payment of a filing fee, contrary to common-law principles of contract formation.[25]

---

[23] *See* H.B. 126, 147th Gen. Assemb. (Del. 2013); *see* Miller, *supra*, at 314 (explaining that in Delaware, the General Assembly rejected the purely contractual view "by legislation that was signed into law on June 30, 2013"). *See generally Carlisle*, 114 A.3d at 605–06.

[24] *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018) (citing a baker's dozen reasons). After his article, the Delaware Supreme Court created another by authorizing LLC agreements to specify contractually that a transaction was incurably void. *See Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 926 (Del. 2023); *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816–17 (Del. 2018). The General Assembly has since abrogated the concept of incurable contractual voidness. *See* 85 Del. Laws ch. 47, § 2 (2025).

[25] *Compare* 6 *Del. C.* § 18-101(9) (defining LLC agreement) *with* Mohsen, *supra*, at 407 ("Thus, in a very fundamental sense, an LLC is not a 'creature of contract' because it cannot be *created* by contract alone. It must be created through formal action, as dictated by statute, in coordination with the state, namely the filing of a certification of formation."). Any contract made before formation is not, strictly speaking, an LLC agreement because an "LLC agreement" is "any agreement . . . of the member or members as to the affairs of a [LLC] and the conduct of its business." 6 *Del. C.* § 18-101(9). An LLC does not exist until a certificate of formation has been filed. 6 *Del. C.* § 18-201(b) ("A [LLC] is formed at the time of the filing of the initial certificate of formation in the office of the Secretary of State or at any later date or time specified in the certificate of formation if, in either case, there has been substantial compliance with the requirements of this section."). There can be no "member or members" until the LLC exists. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 4.05, (2025). The statutory definition of an LLC agreement thus requires the preexistence of a duly formed LLC, which requires steps beyond what is required for ordinary contract formation.

- Requiring payment of an annual fee to the Delaware Secretary of State to maintain the LLC and keep its LLC agreement in force while otherwise making the LLC's existence presumptively perpetual, all contrary to common-law principles of contract duration.[26]

- Authorizing an enforceable LLC agreement with only one party, contrary to common-law principles that require at least two parties to a contract.[27]

- Authorizing an LLC agreement to bind parties who do not sign the agreement or otherwise objectively manifest assent, contrary to common law contractual principles of consent.[28]

---

[26] *Compare* 6 *Del. C.* § 18-1108(a) ("The certificate of formation of a domestic [LLC] shall be cancelled if the [LLC] shall fail to pay the annual tax due under § 18-1107 for a period of 3 years….") *with* 17A Am. Jur. 2d Contracts § 519 ("Where a contract specifies the period of its duration, it terminates on the expiration of such period . . . Where the time for a contract's duration is not specified, or where the language in regards thereto lacks precision, the court may inquire into the intent of the parties and supply the missing term…." (footnotes omitted)) *and id.* § 520 ("A contract which provides that it is to continue for a more or less indefinite period may be held to continue for a reasonable time under the circumstances. …. However, some contracts that mention no period of duration are construed as terminable at will." (footnotes omitted)).

[27] *Compare* 6 *Del. C.* § 18-101(9) (providing that the "[LLC] agreement of a [LLC] having only 1 member shall not be unenforceable by reason of there being only 1 person who is a party to the [LLC] agreement") *with* Restatement (Second) of Contracts § 90 (1981) ("There must be at least two parties to a contract, a promisor and a promisee, but there may be any greater number.") Viewing the LLC agreement as a two-party agreement involving the sole member and the LLC does not solve the problem because the sole member controls both parties. That reality means the LLC's rights under the LLC agreement are only enforceable if the sole member allows the LLC to enforce them, rendering the contract illusory under common law principles. Mohsen, *supra*, at 409.

[28] *Compare* 6 *Del. C.* § 18-101(9) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement. A limited liability company (including any protected series or registered series thereof) is not required to execute its limited liability company agreement. A limited liability company (including any protected series or registered series thereof) is bound by its limited liability company

- Authorizing an LLC agreement to bind a manager upon designation in the LLC agreement, without any requirement that the manager have assented to or even know about the LLC agreement, contrary to common law contractual principles requiring both.[29]

- Permitting amendments to an LLC agreement with only member consent and without the consent of non-member parties like managers and assignees, contrary to the common law contractual requirement of mutual assent by all parties.[30]

- Providing that LLC agreements are not subject to the Statute of Frauds, something common law contracts cannot escape without legislative action.[31]

---

agreement whether or not the limited liability company (or any protected series or registered series thereof) executes the limited liability company agreement.") *with* Restatement (Second) of Contracts § 17 ("the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

[29] *Compare* 6 *Del. C.* § 18-101(12) (defining a "manager" as " person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed, and includes a manager of the limited liability company generally and a manager associated with a series of the limited liability company.") *with* Restatement (Second) of Contracts § 18 ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance.").

[30] *Compare* 6 *Del. C.* § 302(f) ("If a limited liability company agreement does not provide for the manner in which it may be amended, the limited liability company agreement may be amended with the approval of all of the members or as otherwise permitted by law, including as permitted by §§ 18-209(f), 18-217(f), and 18-221(e) of this title. This subsection shall only apply to a limited liability company whose original certificate of formation was filed with the Secretary of State on or after January 1, 2012.") *with* Restatement (Second) of Contracts § 89 (describing requirements for amending an executory contract).

[31]*Compare* 6 *Del. C.* § 18-101(9) ("A limited liability company agreement is not subject to any statute of frauds (including § 2714 of this title).") *with* Restatement (Second) of Contracts ch. 5 (discussing scope and content of statute of frauds).

- Providing for the LLC's separate legal existence and presumptively perpetual life, something a common-law contract cannot accomplish.[32]

- Affording limited liability to members, managers, and assignees for third-party claims, something a common-law contract cannot provide.[33]

- Authorizing penalties against members[34] and managers,[35] contrary to the common-law rule forbidding penalty clauses.[36]

- Mandating that a non-managing member must always be able to sue in the Delaware courts, unless the agreement provides for arbitration, contrary to the common-law principle of freedom of contract.[37]

---

[32] 6 *Del. C.* § 18-201(b) ("A [LLC] formed under this chapter shall be a separate legal entity.").

[33] *Id.* § 18-303(a).

[34] *Id.* § 18-306.

[35] *Id.* § 18-405.

[36] Restatement (Second) of Contracts § 356 cmt. a ("The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy."); Restatement (First) of Contracts § 579 (Am. Law Inst. 1932) ("A bargain for a penalty for the non-performance in the future of a contractual or other duty is illegal."); *see Del. View Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650–51 (Del. 2006) (evaluating whether a contractual provision requiring a $25,000 payment if either party terminated the contract early would be invalid as a penalty or enforceable as a liquidated damages provision); Restatement (Second) of Contracts § 356 ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large, liquidated damages is unenforceable on grounds of public policy as a penalty.").

[37] 6 *Del. C.* § 18-109(d).

- Mandating service on the registered agent or the Delaware Secretary of State as a means of serving managers and liquidating trustees, contrary to the common-law principle of freedom of contract.[38]

- Authorizing limitations on liability subject only to a mandate to preserve "liability for any act or omission that constitutes a bad faith violation of the implied covenant of good faith and fair dealing," contrary to common-law principles of contract forbidding any provisions that would insulate parties from liability for bad-faith conduct generally.[39]

- Mandating application of the doctrine of independent legal significance, a concept foreign to common-law contract principles.[40]

- Contemplating default fiduciary duties for managers, managing members, and controlling members, contrary to common-law contract principles recognizing that parties to a contract ordinarily do not owe fiduciary duties to their counterparties.[41]

- Recognizing a claim for aiding and abetting certain breaches of LLC agreements, a concept that does not exist under the common law of contracts.[42]

---

[38] *Id.* § 18-109(a).

[39] *Compare id.* § 18-1101(e) *with New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 581 & n.235 (Del. Ch. 2023) (discussing LLC Act provision) *with id.* at 591–92 (collecting authorities holding that parties may not attempt by contract to protect themselves from liability for fraud or bad faith).

[40] 6 *Del. C.* § 18-1101(h).

[41] *Compare id.* § 18-1101(c) *with Blueacorn PPP, LLC v. Pay Nerd LLC*, 310 A.3d 590, 594 (Del. Ch. 2024) ("The Court of Chancery generally does not apply fiduciary duty doctrine to ordinary commercial transactions.") *and Petenbrink v. Superior Home Builders, Inc.*, 1999 WL 1223786, at *2 (Del. Super. Nov. 1, 1999) (explaining that ordinarily a contract "will not carry with it any fiduciary obligations" but that an exception can exist when there are "facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arm's length commercial contract.").

[42] *See* Mohsen, *supra*, at 442–43 (collecting authorities).

- Limiting the ability of members to sue for breach of contractual obligations by characterizing certain claims for breach of the LLC agreement as derivative, a concept that does not exist under the common law of contracts.[43]

- Mandating limitations on distributions, a concept that does not exist under the common law of contracts.[44]

- Mandating liability for improper distributions, a concept that does not exist under the common law of contracts.[45]

- Mandating steps to wind up an LLC's existence and, with it, the LLC agreement, a concept that does not exist under the common law of contracts.[46]

- Mandating the priority of debt over equity when winding up an LLC and distributing its assets, a concept that does not exist under the common law of contracts.[47]

Some of these departures make LLC agreements supra-contractual by permitting LLC agreements to do more than what contract law authorizes. Others are mandatory provisions that constrain what an LLC agreement can do. The list is illustrative and not exclusive.

Because LLCs are *primarily* creatures of contract, the first step when analyzing a dispute involving the internal affairs of an LLC is to examine the LLC agreement to see if it addresses the issue. If it does, then the contract presumptively

---

[43] *See id.* at 444–45 (collecting authorities).

[44] *See* 6 *Del. C.* § 18-607(a).

[45] *Id.* §§ 18-607(b), 18-804(c).

[46] *See id.* § 18-804(b).

[47] *See id.* § 18-804(a)(1).

controls,[48] unless the provision violates one of the exceedingly few mandatory provisions in the LLC Act. If the LLC agreement is silent, then the next step is to look to the LLC Act to see if one of its default provisions applies.[49] If neither source addresses the matter, then the LLC Act instructs that "the rules of law and equity . . . shall govern."[50]

A claim for breach of an LLC agreement therefore starts out like any other claim for breach of contract.[51] Under Delaware law, the elements of a claim for breach of contract are (1) the existence of a contractual obligation, (2) a breach of that obligation by the defendant, and (3) a causally related injury that (4) warrants a remedy.[52]

No one disputes that the LLC Agreement is a valid contract. Whether Count I states a claim for breach of the Repayment Obligation presents an issue of contract interpretation. Except the issues where the LLC Act specifies a departure from

---

[48] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999); *see Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *7 (Del. Ch. Aug. 1, 2014); Symonds & O'Toole, *supra*, § 1.03[A] [2], at 1–14.

[49] *Elf Atochem*, 727 A.2d at 291; *see Levey*, 2014 WL 3811237, at *7; Symonds & O'Toole, *supra*, § 1.03[A] [2], at 1–14.

[50] 6 *Del. C.* § 18-1104.

[51] *See BET FRX LLC v. Myers*, 2022 WL 1236955, at *4 (Del. Ch. Apr. 27, 2022).

[52] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

contract law, "[t]he usual principles of contract interpretation apply to claims for breach of an LLC Agreement."[53]

Under Delaware law, the purpose of contract interpretation is "to effectuate the parties' intent."[54] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[55] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[56] "Contract language is not ambiguous merely because the parties dispute what it means."[57] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[58] "Delaware courts will not destroy or twist [contract] language under the guise of construing it."[59] "If a writing

---

[53] *BET FRX*, 2022 WL 1236955, at *4.

[54] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[55] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[56] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[57] *Id*.

[58] *Id.; see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[59] *Rhone-Poulenc*, 616 A.2d at 1195.

is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[60]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[61] The Delaware Supreme Court has also instructed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract."[62] A reasonable reading therefore must be "situated in the commercial context between the parties."[63] But this principle cannot be used to override the plain language of the agreement. "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[64]

---

[60] *City Inv. Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[61] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[62] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

[63] *Id.* at 926–27.

[64] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27).

## 2. Is The Class B Loan A Capital Contribution?

The parties' core dispute concerns whether the Class B Loan constitutes a capital contribution or an enforceable loan. Each side cites provisions in the LLC Agreement to support its characterization, but the issue is more foundational. A loan is a form of debt that generally cannot constitute a capital contribution in return for equity. From that standpoint, describing a loan as a capital contribution makes a category error. But that is not the end of the analysis, because a loan with advantageous terms comes bundled with an implicit capital contribution. That appears to be the case with the Class B Loan.

### a. The Difference Between Debt And A Capital Contribution

Starting at a high level, both loans and capital contributions provide capital to an enterprise, but the law treats them differently. A loan is a debt claim that has priority over equity and carries a right to repayment that the creditor can enforce. The debt claim's upside is presumptively fixed at the amount provided plus interest. A capital contribution, by contrast, results in an equity interest. The value of that interest depends on the venture's success, and any claim it has on the venture's net assets comes last in priority. The capital contributor presumptively has no ability to force the entity to return his capital contribution, and contractual provisions contemplating returns of capital are subject to statutory and common law limitations.

20

Delaware entity law draws a sharp distinction between equity and debt, citing equity's lack of a right to repayment.[65] The distinction between a capital contribution in exchange for equity and a loan to the corporation figured most prominently in pre-2004 corporate cases. Then, as now, stock with par value must be issued for consideration having a value at least equal to the par value of the shares, an amount known as its stated capital.[66] Before 2004, however, the Delaware Constitution prohibited the issuance of stock "except for money paid, labor done, or personal property or leases thereof actually acquired by such corporation."[67] Under that

---

[65] *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*12 (Del. Ch. Apr. 14, 2017) ("Delaware courts have held consistently that preferred stock is equity, not debt."); *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 991 (Del. Ch. 2010) (contrasting preferred stock with debt), *aff'd,* 37 A.3d 205 (Del. 2011); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39 n.8 (Del. Ch. 2013) ("[P]referred stock is senior in defined respects to common, but it is equity, not debt, and it remains subject to the statutory and common law limitations that apply to equity."); *Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 225 (Del. Ch. 2006) ("Even where preferred shares in some way straddle the line between debt and equity, the cases which have grappled with that question in the context of bankruptcy law have held, almost universally, that those shares are forms of equity."); *HB Korenvaes Invs., L.P. v. Marriott Corp.*, 1993 WL 205040, at \*5 (Del. Ch. June 9, 1993) (Allen, C.) ("[T]he holder of preferred stock is not a creditor of the corporation."); *see also Mesa Hldg. Ltd. P'ship v. Bicoastal Corp.*, 1991 WL 17172, at \*2 (Del. Ch. Feb. 11, 1991); *Moore v. Am. Fin. & Sec. Co.*, 73 A.2d 47, 48 (Del. Ch. 1950) (Seitz, V.C.); *Starring v. Am. Hair & Felt Co.*, 191 A. 887, 890 (Del. Ch.) (Wolcott, C.), *aff'd,* 2 A.2d 249 (Del. 1937).

[66] *See* 8 *Del. C.* § 153(a) ("Shares of stock with par value may be issued for such consideration, having a value not less than the par value of the shares so issued, as determined from time to time in accordance with § 152 of this title, or by the stockholders if the certificate of incorporation so provides.").

[67] Del. Const. art. IX, § 3 (1897). The statute implementing this requirement stated at the time that "[t]he capital stock so issued shall be deemed to be fully paid and nonassessable stock, if: (1) The entire amount of such consideration has been

21

provision, a promise to lend money to the corporation was not valid consideration for stock.[68]

In 2004, Delaware repealed the requirement of constitutional consideration[69] and revised the Delaware General Corporation Law ("DGCL") so that consideration can consist of "any tangible or intangible property or any benefit to the corporation, or any combination thereof."[70] The consideration's value still must at least exceed the

---

received by the corporation in the form of *cash, services rendered, personal property, real property, leases of real property or a combination thereof;* or (2) not less than the amount of the consideration determined to be capital pursuant to § 154 of this title has been received by the corporation in such form and the corporation has received a binding obligation of the subscriber or purchaser to pay the balance of the subscription or purchase price." 8 *Del. C.* § 152 (2003) (emphasis added).

[68] *Danvir Corp. v. Wahl*, 1987 WL 16507, at *8 (Del. Ch. Sept. 8, 1987) ("There is evidence that Horace Wahl loaned money to Dominick and that James helped out at Danvir. However, I find that neither of these facts is sufficient to establish that the shares were issued for consideration. If, in fact, monies were loaned to Danvir by Horace Wahl, there was no investment made in the company that would act as consideration for the issuance of stock."); *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 835 (Del. Ch. 1954) (Seitz, C.) (holding that loan of $6,300 to the corporation could not support issuance of stock, but that directors could cure the failure to provide consideration by paying the original price plus interest); *Cahall v. Lofland*, 114 A. 224, 233 (Del. Ch. 1921) ("A promissory note in a broad sense is property; but it is only a promise to pay money and, therefore, is a mere evidence of indebtedness. A promise to pay money is not 'money paid,' and cannot be so taken, and it would be a travesty to say that it is 'property actually acquired' and, therefore, may be taken in payment for shares where there is a prohibition such as there is in Delaware."), *aff'd,* 118 A. 1 (Del. 1922).

[69] *See* 85 Del. Laws. ch. 5 (2004); 84 Del. Laws. ch. 281 (2003).

[70] 8 *Del. C.* § 152(a).

shares' stated capital,[71] and the corporation must allocate to capital an amount of consideration at least equal to its stated capital, viz., the aggregate par value of the issued shares.[72]

Under the current framework, a loan to the corporation resulting in corporate debt can provide "benefit to the corporation" sufficient to support the issuance of shares. Although a loan on market terms that the corporation could otherwise secure does not provide the statutorily required benefit, a loan that the corporation could not otherwise secure, or a loan on advantageous terms, does confer a benefit.

A below-market loan is the equivalent of a market-rate loan plus a subsidy. Envision that a risky corporation seeks to borrow $2 million for a period of six months and that a third-party venture lender would require an interest rate of 30% per annum, reflecting market terms.[73] At the end of the six months, the corporation must

---

[71] *Id.* § 152(e) ("the minimum consideration for which shares of stock may be issued by the corporation may not be less than the consideration (if any) required under § 153 of this title.").

[72] *Id.* § 154 ("Any corporation may, by resolution of its board of directors, determine that only a part of the consideration which shall be received by the corporation for any of the shares of its capital stock which it shall issue from time to time shall be capital; but, in case any of the shares issued shall be shares having a par value, the amount of the part of such consideration so determined to be capital shall be in excess of the aggregate par value of the shares issued for such consideration having a par value, unless all the shares issued shall be shares having a par value, in which case the amount of the part of such consideration so determined to be capital need be only equal to the aggregate par value of such shares. In each such case the board of directors shall specify in dollars the part of such consideration which shall be capital.").

[73] The venture lender likely would likely insist on compound, not simple, interest. The venture lender also would likely insist that the loan be convertible into

repay the $2 million plus interest of $300,000. Now assume instead that an insider is willing to make the six-month loan for $2 million at zero interest. At the end of the six months, the corporation need only repay the $2 million. As a matter of economic substance, the insider has made a loan and contributed capital in the form of the subsidy represented by the corporation's ability to forgo paying $300,000 in interest at the six-month mark. Discounting back at a rate of 30% simple interest per annum, it takes an upfront amount of $260,869.57 to generate the $300,000. On these simplified assumptions, the no-interest loan is the economic equivalent of a market-rate loan plus a capital contribution of $260,869.57.

Since 2004, the DGCL permits an advantageous loan to satisfy statutory capital requirements, but the corporation would have to allocate some cash value capital in an amount at least equal to the aggregate par value of the shares. The loan would not itself be capital.

The LLC Act does not adopt the corporate rules on minimum consideration and stated capital, but it does maintain the distinction between capital contributions and debt. It defines "contribution" in terms of assets provided to the LLC.[74] Separately, it recognizes that a member can loan money to the LLC and, in that capacity, "has the

---

equity and come with warrant coverage. To keep the illustration simple, this decision sets those complexities aside.

[74] 6 *Del. C.* § 18-101(3) ("'Contribution' means any cash, property, services rendered or a promissory note or other obligation to contribute cash or property or to perform services, which a person contributes to a limited liability company in the person's capacity as a member.").

same rights and obligations" as a non-member creditor.[75] The LLC Act thus does not envision that a loan to the LLC could constitute a capital contribution.[76]

The LLC Act also reflects the distinction between equity and debt by imposing corporate-like limitations on distributions to equity that prevent the LLC from making a distribution that would render the LLC insolvent.[77] When making that determination, the LLC Act calls for excluding "the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of

---

[75] 6 *Del. C.* § 18-107 ("Except as provided in a limited liability company agreement, a member or manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume 1 or more obligations of, provide collateral for, and transact other business with, a limited liability company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a person who is not a member or manager.").

[76] Potential for confusion exists because the LLC Act includes "a promissory note" in the list of items that can constitute a contribution. That concept envisions the promissory note as an asset—a negotiable promissory note from other party— that the holder can contribute to the entity. It does not envision a loan of money to the entity. *See* n. 83, *infra*.

[77] *See id.* § 18-607(a) ("A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of that property exceeds that liability. For purposes of this subsection (a), the term 'distribution' shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program.").

that property exceeds that liability," thereby focusing on the incremental equity value.[78] The LLC Act returns to the distinction when addressing liquidation by mandating that creditor claims—including member-held debt—be paid before making liquidating distributions.[79]

Here, those principals suggest that to the extent the Class B Loan was a real loan, it cannot be a capital contribution, no matter what the parties called it. But that is not the end of the analysis. Under current law, the distinction between a loan and a capital contribution made in exchange for equity matters more for an LLC than a corporation. That is because when an LLC opts to be taxed as a partnership (as the Company did and many do), it must maintain a capital account for each member and credit the value of the member's capital contribution to that account, which then rises and falls with the member's share of the entity's profits and losses. The sum of the capital accounts reflects the LLC's equity at book value. A debt the LLC owes would

---

[78] *See id.*

[79] 6 *Del. C.* § 18-804 (calling for assets to be distributed in liquidation first "[t]o creditors, including members and managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the limited liability company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to members and former members under § 18-601 or § 18-604 of this title," then second to "[u]nless otherwise provided in a limited liability company agreement, to members and former members in satisfaction of liabilities for distributions under § 18-601 or § 18-604 of this title," and third "[u]nless otherwise provided in a limited liability company agreement, to members first for the return of their contributions and second respecting their limited liability company interests, in the proportions in which the members share in distributions.").

26

not be reflected in the LLC's equity value. It would be subtracted from the equity value to yield enterprise value.

Tax regulations are the principal source of law on capital accounts, and they reinforce the distinction between a capital contribution and debt. The LLC "emerged as the brainchild of a group of sophisticated entity lawyers and tax practitioners who sought the entity-law Holy Grail of limited liability and partnership tax treatment."[80] In 1977, they convinced the State of Wyoming to adopt the first LLC statute, and in 1988, the Internal Revenue Service (the "IRS") ruled that the entity hybrid could indeed deliver both features.[81] Given this history, "it is logical that the LLC Act would use tax-related concepts . . . consistently with the tax code, or at least would avoid using them inconsistently with the tax code."[82]

The tax regulations on partners' capital accounts provide generally that a partner's share of a partnership liability is *not* included in the partner's capital

---

[80] *In re P3 Health Gp. Hldgs., LLC*, 282 A.3d 1054, 1067 (Del. Ch. 2022).

[81] *See* Symonds & O'Toole, *supra*, § 1.01[A] & [B]; Susan Pace Hamill, *The Story of LLCs: Combining the Best Features of a Flawed Business Tax Structure*, in *Business Tax Stories*, 295 (Steven A. Bank & Kirk J. Stark eds., 2005). Ever since, tax planning has been a major driver of governance decisions involving LLCs. *See generally* John M. Cunningham & Vernon R. Proctor, *Drafting Delaware Limited Liability Company Agreements: Forms and Practice Manual* § 1.03[B] (2011) (titling section: "The Importance of Tax Knowledge in Handling Delaware LLC Formations"); *id.* § 15.02 (titling section: "The Importance of Tax Knowledge for Lawyers Engaged in LLC Formation Practice"); *id.* chs. 15–22 (eight chapters addressing implications of federal and state tax issues for LLC formation).

[82] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *10 (Del. Ch. July 19, 2019).

account.[83] If a partner loans money *to* the partnership, that generally is *not* a capital contribution. It is partnership debt.

By contrast, if a partner provides the partnership with an IOU for a capital contribution, then that is the partner's debt, not the partnership's. Under the tax regulations, the partner's capital account "will be increased with respect to such note only when there is a taxable disposition of such note by the partnership or when the partner makes principal payments on such note."[84]

---

[83] 26 C.F.R. § 1.704-1(b)(2)(iv)(*c*) ("Treatment of liabilities. For purposes of this paragraph (b)(2)(iv), (1) money contributed by a partner to a partnership includes the amount of any partnership liabilities that are assumed by such partner (other than liabilities described in paragraph (b)(2)(iv)(b)(5) of this section that are assumed by a distributee partner) **but does not include increases in such partner's share of partnership liabilities (see section 752(a))**, and (2) money distributed to a partner by a partnership includes the amount of such partner's individual liabilities that are assumed by the partnership (other than liabilities described in paragraph (b)(2)(iv)(b)(2) of this section that are assumed by the partnership) **but does not include decreases in such partner's share of partnership liabilities** (see section 752(b))." (bold emphasis added)).

The tax regulations also explain why the LLC Act includes in the definition of "contribution" "a promissory note or other obligation to contribute cash or property or to perform services, which a person contributes to a limited liability company in the person's capacity as a member." 6 *Del. C.* § 101(3). That language contemplates a situation where the member is the maker of the note and the LLC is the payee. It does not contemplate a debt of the LLC being treated as a capital contribution. The tax regulations address this by contemplating generally that "if a promissory note is contributed to a partnership by a partner who is the maker of such note, such partner's capital account will be increased with respect to such note only when there is a taxable disposition of such note by the partnership or when the partner makes principal payments on such note." 26 C.F.R. § 1.704-1(b)(2)(iv)(*d*)(*2*).

[84] 26 C.F.R. § 1.704-1(b)(2)(iv)(*d*)(*2*) ("Notwithstanding the general rule of paragraph (b)(2)(iv)(*b*)(*2*) of this section, except as provided in this paragraph (b)(2)(iv)(*d*)(*2*), if a promissory note is contributed to a partnership by a partner who is the maker of such note, such partner's capital account will be increased with

Proposed treasury regulations recognize that a below-market loan could include an implicit capital contribution based on its economic substance.[85] Those regulations treat a below-market loan to a partnership just like the corporate example provided previously. The only difference is that rather than comparing the zero-interest loan to a market rate, the comparison would be the short-term Applicable Federal Rate. The exact amount of the delta would depend on whether the loan was a six-month term loan or a demand loan repaid in six months.

Creditors frequently contend that an insider loan represents a de facto capital contribution, and courts can use their equitable authority to recharacterize an insider loan as a capital contribution.[86] The pleadings do not present that issue. The dispositive question for purposes of Count I is whether it is reasonably conceivable

respect to such note only when there is a taxable disposition of such note by the partnership or when the partner makes principal payments on such note. See example (1)(ix) of paragraph (b)(5) of this section.").

[85] *See* Treatment of Below Market Interest Rate Loans, 50 Fed. Reg. 33,553 (proposed Aug. 20, 1985) (to be codified at 26 C.F.R. pt. 1). The IRS proposed the regulations in 1985, but they were not finalized. The IRS and tax practitioners follow the regulations as persuasive authority.

[86] *See, e.g.*, *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456–58 (3d Cir. 2006) (affirming trial court decision against recharacterization); *In re AutoStyle Plastics*, 269 F.3d 726, 747–53 ( (6th Cir.. 2001) (same);*GC Broadway, LLC v. AN SM 1925 Broadway Holdings, LLC*, 2026 WL 539233, at *15–16 (Del. Ch. Feb. 26, 2026) (declining to recharacterize LLC debt as equity); *Neem Int'l CV v. Shulman*, 2025 WL 3778917, at *26–28 (Del. Ch. Dec. 31, 2025) (recharacterizing corporate debt as equity); *see also Nelson v. Emerson*, 2008 WL 1961150, at *5, 8 (Del. Ch. May 6, 2008) (discussing partial recharacterization of debt to equity).

that the Class B Loan was a loan, despite competing characterizations in the LLC Agreement.

Taking on the foundational issue reveals that the Class B Loan can be both a loan and a capital contribution. The facts alleged in the Complaint and the terms of the Class B Loan support an inference that Hassanein loaned money to his friend on favorable terms. He provided nearly $2 million in financing to a shell company with no assets, no revenues, and no apparent ability to repay him other than his friend's promise to make a capital contribution. He charged zero interest for the six-month term and only 6% simple interest after that. Any risk-hungry venture debt provider would demand far more onerous terms, if they would make the loan at all. Based on cases I have presided over, I would think at a minimum 25–30% annual interest, compounding daily, a personal guarantee from Eliovits, a pledge of Eliovits's equity in DermBiont, and the right to convert the loan into equity in DermBiont to capture upside.

By providing the Company with the Class B Loan on such inferably advantageous terms, Hassanein inferably both made a loan and made an implicit capital contribution in the form of the benefit conferred by the subsidized terms. As a doctrinal matter, calling the Class B Loan a loan does not prevent it from also being part of his capital contribution. Likewise, labeling the Class B Loan a loan does not prevent it from being a loan. The Class B Loan could be both.

### b. The LLC Agreement's Treatment Of The Class B Loan

The parties understandably focus more on how the LLC Agreement treats the Class B Loan. Although provisions describe it both as a loan and a capital

30

contribution, the LLC Agreement predominantly treats it as a loan. At the pleading-stage, it is reasonably conceivable that the Class B Loan is a loan.

Section 3.1(e)(ii) of the LLC Agreement provides for the Class B Loan. It states:

> The Obligations of the Class B Units are that as the initial Capital Contribution of the Class B Units, the Class B Member must, in aggregate, lend to the Company the sum of $1,924,417.78 (the "Class B Loan"). The Class B Loan shall not accrue interest, and the sole return on the Class B Loan shall be the Rights and Privileges granted to the Class B Units under this Agreement; provided however that, if the Company does not repay the Class B Loan in full on or prior to the [Maturity Date], then simple interest at a rate of six percent (6%) per annum shall accrue and be payable on the unpaid outstanding amount of the Class B Loan, which amount shall accrue from the first date that the Class B Loan [was] made, and which interest shall be payable every six months in arrears, with the first interest payment due and payable on the [Maturity Date].[87]

Hassanein satisfied his obligation to make the Class B Loan by advancing $1,924,417.78 and paying that amount to DermBiont at Eliovits's direction.

Section 3.2 of the LLC Agreement treats the Class B Loan as a loan by establishing the Repayment Obligation. It states: "Immediately upon receipt of the capital contributions from the Class A Members under Section 3(d)(ii), the Company shall use those amounts to repay to the Class B Member the Class B Loan."[88]

The Repayment Obligation thus mandates repayment of the Class B Loan immediately after the satisfaction of a condition. That condition is "receipt of the

---

[87] LLCA § 3.1(e)(ii).

[88] *Id.* § 3.2.

31

capital contributions from the Class A Members under Section 3(d)(ii)" (the "Contribution Condition").[89]

Section 3(d)(ii) of the LLC Agreement imposes an obligation on Eliovits to contribute the capital necessary to satisfy the Contribution Condition (the "Contribution Requirement"). It states: "The Obligations of the Class A Units are that on or prior to the [Maturity Date], the Class A Member shall make capital contributions to the Company in an amount sufficient to repay in full to the Class B Member the Class B Loan."[90] The Contribution Requirement is mandatory and specifies a date for compliance. Put simply, Eliovits had to satisfy the Contribution Requirement on or before the Maturity Date.

There are a few provisions that suggest treating the loan as a capital contribution. After confirming that a member can make a loan to the Company and that a member loan "shall not be a capital contribution," the LLC Agreement states: "For the avoidance of doubt, the Class B Loan shall not be deemed for any purpose to be a Member Loan under this Section 3.4."[91]

The LLC Agreement also describes the Class B Loan in at least three places as one of Hassanein's capital contributions (the other being $100 in cash).[92] The LLC

---

[89] *Id.*

[90] *Id.* § 3.1(d)(ii).

[91] *Id.* § 3.4.

[92] *Id.* § 3.1(b) ("The Members agree that each of the Members has made the initial capital contribution to the Company in the amount set forth opposite such

32

Agreement also calls for establishing a capital account for each member and expressly invokes the tax regulations governing partnerships.[93]

The conflicting treatment of the Class B Loan reflects the principals' loose use of terms of art. At a minimum, the Complaint's allegations and the language of the LLC Agreement make it reasonably conceivable that the Class B Loan was a loan. At best for the defendants, the LLC Agreement contains other provisions that might produce ambiguity as to whether the Class B Loan was a loan. Assuming that were the case, the court would not resolve that ambiguity at the pleading stage.[94] For

---

Member's name in Exhibit A."); *id*. § 3.1(e)(ii) ("The Obligations of the Class B Units are that as the initial Capital Contribution of the Class B Units, the Class B Member must, in the aggregate, lend to the Company the sum of $1,924,417.78…."); *id*. § 3.1(f) ("Each Member hereby covenants and agrees to make an initial contribution to the capital of the Company in exchange for the issuance of Units."); *id*. Ex. A (identifying "Amount of Initial Capital Contribution" for Hassanein as "$100 plus $1,924,417.78 of Class B Loans").

[93] *See id*. §§ 3.1(g)(i) & (ii) (citing 26 C.F.R. § 1.704-1(b)(2)(iv)(c)); *id*. § 3.1(g)(iii) (citing 26 C.F.R. § 1.704-1(b)); *id*. § 3.1(i) (six citations to 26 C.F.R. § 1.704-2 and its subparts); *id*. § 10.7 (citing 26 C.F.R. § 1.704-1(b)(2)(ii)(g)).

[94] *BitGo Hldgs, Inc. v. Galaxy Digital Hldgs, Ltd.*, 319 A.3d 310, 329–33 (Del. 2024) (reversing pleading-stage dismissal where Delaware Supreme Court held on appeal that contract was ambiguous); *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents."); *Kahn v. Portnoy*, 2008 WL 5197164, at *13 (Del. Ch. Dec. 11, 2008) ("I am unable, in the context of a motion to dismiss, to resolve this ambiguity [in the LLC agreement] by choosing among reasonable interpretations of the contract. After careful consideration of the allegations in the complaint, I conclude that plaintiff has alleged sufficient facts to survive the motion to dismiss.").

purposes of analyzing the motions to dismiss, therefore, the Class B Loan is a loan, and the Repayment Obligation is a contractual obligation to repay the Class B Loan.

### 3. The Claim For Breach And The Prevention Doctrine.

In Count I, Hassanein seeks to enforce the Class B Loan. He contends that the Company breached the Repayment Obligation by failing to repay the Class B Loan on the Maturity Date. That theory states a claim on which relief can be granted.

The Repayment Obligation and the Contribution Requirement inferably work together to require repayment of the Class B Loan on or before the Maturity Date. The Contribution Requirement requires a sufficient capital contribution on or before the Maturity Date. The Repayment Obligation requires immediate repayment upon satisfaction of the Contribution Requirement. The Company thus must satisfy the Repayment Obligation on or before the Maturity Date. The Company has never satisfied the Repayment Obligation, which Hassanein argues constitutes a breach. Although Hassanein is correct, the analysis involves more steps.

By its terms, the Repayment Obligation only arises after the Contribution Requirement has been satisfied, giving rise to what this decision has labeled the Contribution Condition. As a general matter, "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."[95] Eliovits has never satisfied the Contribution Condition. As a textual matter, therefore, the Repayment Obligation never came due.

---

[95] Restatement (Second) of Contracts § 225(1) (1981); *accord id.* § 235 cmt. b.

34

But the prevention doctrine modifies the general rule, and it conceivably applies here.[96] "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[97] "When the non-occurrence of a condition of a duty is excused . . . the obligor is liable for the same damages for which he would have been liable had the duty originally been unconditional."[98] The prevention doctrine only applies where the breaching party's lack of cooperation in satisfying the condition "constitutes a breach, either of

[96] *See Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *53 (Del. Ch. Apr. 30, 2021).

[97] Restatement (Second) of Contracts § 245; *accord BitGo Hldgs.*, 319 A.3d at 333 ("[T]he 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." (internal quotation marks omitted)); *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("[A] party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."); 13 Williston on Contracts § 39:3 (4th ed. 2023), Westlaw (database updated May 2026) ("When a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to its promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance."); 10 Corbin on Contracts § 53.5 (1961), LexisNexis (database updated 2026) ("[C]ourts have long recognized the implied promise not to prevent or hinder the other party's performance of the contract. . . . [T]he doctrine of 'prevention' stands for the general proposition that a party cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." (footnote omitted)); 17B C.J.S. Contracts § 769, Westlaw (database updated Apr. 2026) ("When one party prevents the other party's performance of a term of a contract, it excuses the nonperformance and provides a defense in a suit for breach by the nonperformance.").

[98] Restatement (Second) of Contracts § 225 cmt. c.

a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court."[99]

Here, the Contribution Requirement imposes an obligation on Eliovits, and his breach of that obligation contributed to the Company's failure to satisfy the Repayment Obligation. It is therefore reasonably conceivable that the Contribution Condition was excused, and the Repayment Obligation became due on the Maturity Date. Thus, the Company breached the LLC Agreement by failing to repay the Class B Loan. Count I therefore states a claim against the Company for breach of the LLC Agreement.

### 4. The No-Maturity-Date Argument

To defeat that outcome, the Company argues that it has no obligation to repay Hassanein because the LLC Agreement does not specify a maturity date for the Class

---

[99] *Id.* § 245 cmt. a. *See, e.g., Snow Phipps Gp.*, 2021 WL 1714202, at *2 ("Applying the prevention doctrine, this decision deems the debt financing condition met because the buyers contributed materially to lack of debt financing by breaching their reasonable–best–efforts obligation."); *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12–13 & n.139 (Del. Ch. Sept. 19, 2022) ("GT materially contributed to KPMG not reaching a final valuation decision when it instructed KPMG to stop work and insisted that any further work product address privatization. If GT's performance was conditioned upon KPMG issuing a formal valuation, GT was obliged not to interfere with the exercise of KPMG's discretion in reaching that valuation—particularly by injecting port privatization into the analysis, which the BLA forbade . . . At the very least, the BLA includes an implied term requiring the parties to act in good faith and not deliberately or unreasonably prevent KPMG from formalizing its valuation.") (footnotes omitted)); *Monica v. Delta Data Software, Inc.*, 2026 WL 370756, at *9 (Del. Super. Feb. 10, 2026) ("The complaint . . . pleads that conduct breached the implied covenant, which is sufficient to trigger the prevention doctrine.").

B Loan. As the Company sees it, the Class B Loan will never come due. That defense runs contrary to the language of the LLC Agreement and default principles of law.

For starters, the LLC Agreement inferably specifies a maturity date. The Repayment Obligation and the Contribution Requirement work together to require repayment of the Class B Loan on or before the Maturity Date. The LLC Agreement even uses the term "Maturity Date." The Maturity Date passed on March 21, 2022, more than four years ago. The Class B Loan is inferably a six-month term loan.

Setting that point aside, the LLC Agreement's silence on a payment date does not mean the Class B Loan never comes due. Under Delaware law, a loan that does not "state any time of payment" is "payable on demand."[100] After six months had passed, and once the prevention doctrine inferably excused the Contribution Condition, the Class B Loan became payable on demand. Hassanein demanded repayment on March 9, 2025. Regardless of any earlier repayment obligation, the Company became obligated to repay the Class B Loan with interest as of that date.

### 5. The Illusory Loan Argument

Moving beyond its no-maturity-date argument, the Company argues more generally that the Class B Loan was not a loan because it did not include terms one might find in a more detailed loan agreement. The absence of more detailed provisions does not mean that the Class B Loan was not a loan.

According to the Company, the Class B Loan cannot be a loan because

---

[100] 6 *Del. C.* § 3-108(a).

(1) the contract does not provide a due date for the Class B Loan repayment;

(2) [the LLC Agreement] contemplates nonpayment of the Class B Loan by the Class B Maturity Date;

(3) the recourse the Agreement provides for failure to repay the Class B Loan by the Maturity Date is interest at 6% per annum;

(4) the Agreement does not define default on the Class B Loan and does not require repayment of principal by a date certain;

(5) the Agreement does not provide any repayment structure or schedule; and

(6) the Agreement contains no provision to accelerate the principal.[101]

Later, the Company repeats these objections using different language and adds that, "[t]here is no provision entitling Hassanein to demand immediate payment."[102] The Company also complains that no provision addresses "when and how [interest] is repaid."[103]

None of these objections, individually or in the aggregate, suggests that the Class B Loan is not a loan.[104] This decision has addressed the first objection, which contends that the Class B Loan had no due date. The Class B Loan is inferably a six-month term loan due on the Maturity Date. At best for the Company, the Class B Loan became a demand loan once the Maturity Date passed and the Contribution

---

[101] Dkt. 30 at 9–10.

[102] *Id.* at 18.

[103] *Id.*

[104] The magistrate judge accepted the argument that the omissions of these provisions meant that the loan was not a loan. *See* Report at *5.

Condition was excused. Under that scenario, the loan did not have to provide for a repayment date or a provision entitling Hassanein to demand immediate repayment. The law implied those terms.

The second objection observes that the Class B Loan contemplates non-payment. Every loan contemplates non-payment. Lenders do not like contemplating that possibility, but they plan for it. Loans often provide for an increased interest rate and additional fees after the due date passes. That does not mean the loan does not have to be repaid. Here, the Class B Loan generously provides for zero interest during the six-month term and an inferably low interest rate of 6% simple interest after that. That is the same concept as a base rate during the loan term followed by an increased rate after the due date. If the Class B Loan had charged 3% interest during the term and 6% interest after the Maturity Date, then the mechanism might have been clearer. Hassanein's generosity in charging zero interest during the term and 6% afterward does not suggest he never expected to be repaid.

The third objection asserts that Hassanein's only recourse is 6% simple interest. That contention is another way of arguing that Hassanein made an equity contribution, not a loan. For the reasons already discussed, it is reasonably conceivable—at a minimum—that the Class B Loan was a loan. After the Maturity Date passed, and once the Contribution Condition was excused, Hassanein could call the Class B Loan at any time. The existence of the 6% interest was not his "recourse." A loan that the borrower never has to repay is not a loan, even if it pays interest. The

6% interest partially compensated Hassanein for risk and the time value of money. The interest component had to be paid for the loan to be satisfied.

The fourth objection contends that the Class B Loan does not define default (true) and does not specify repayment on a date certain (not true). The Class B Loan specifies repayment on the Maturity Date. The Company failed to pay, giving rise to the most obvious default of all: a payment default. The fact that the Class B Loan did not specify other forms of default was a benefit to the Company. It did not relieve the Company of its obligation to repay the Class B Loan when due.

The fifth objection contends that the Class B Loan does not provide a repayment structure or schedule. The Company later objects that the Class B Loan does not explain how interest is to be paid. The Company seems to be envisioning an amortized loan with a monthly or quarterly payment of principal and interest, but that is only one repayment structure. The Class B Loan contemplates the simplest structure of all—a single balloon payment with principal and all accrued interest due on the same date. If the Company had repaid the Class B Loan at the Maturity Date, then only principal would have been due. Now that the Class B Loan is past due and has started accruing interest, the principal with all accrued interest is due on demand, in a single amount, at the time of repayment.

The sixth objection contends that the Class B Loan does not contain any provision requiring acceleration. True and irrelevant. The Class B Loan specifies repayment on the Maturity Date. Once the Maturity Date passes and a payment default has occurred, the loan is due. Acceleration contemplates payment *before* the

40

loan otherwise would be due. The fact that the Class B Loan did not provide for acceleration was another benefit to the Company. It did not relieve the Company of its obligation to repay the Class B Loan.

The simplest kind of loan is an IOU. It might be written on a slip of paper or a napkin. It might provide for interest or no interest. An IOU is an unsecured demand note. Despite its simplicity, it is an enforceable loan. The Class B Loan was more complex, but not by much. It too was an enforceable loan.

### 6. Count I States A Claim Against The Company.

The Complaint and the terms of the Class B Loan support an inference that the Class B Loan is a simple balloon loan that contemplated a single payment after six months. If all went as planned, Hassanein's compensation for making the loan was his 50% interest in the Company. The Class B Loan began to accrue interest after six months to compensate Hassanein for the time value of money. That does not mean the Class B Loan did not have to be repaid. At a minimum, it was due on demand, and Hassanein demanded repayment on March 9, 2025.

Nothing more was required for an enforceable loan. Because the prevention doctrine inferably prevents the Company from relying on the Contribution Condition, Hassanein can enforce the Repayment Obligation. Count I states a claim on which relief can be granted. Hassanein can assert that claim directly against the LLC.

### B. Count II: Hassanein's Claim Against Eliovits for Breach Of The LLC Agreement

Count II asserts that Eliovits breached the LLC Agreement by failing to satisfy the Contribution Requirement on or before the Maturity Date. The defendants

41

dispute whether Hassanein has standing to assert the claim. Standing is not an issue. Although the claim is likely direct, Hassanein can pursue it derivatively as a member of the Company.[105]

As a threshold matter, but for the dispute over standing, Count II states a claim on which relief can be granted. Count II is another claim for breach of contract, this time against Eliovits for breach of the Contribution Requirement. As before, the LLC Agreement is a valid contract. The Contribution Requirement mandated that Eliovits contribute funds sufficient to repay the Class B Loan on or before the Maturity Date. The Complaint pleads that Eliovits never satisfied the Contribution Requirement. That is a straightforward claim for breach of contract.[106]

To argue for dismissal, Eliovits contends that Hassanein lacks standing to claim breach of the Contribution Requirement because the claim is derivative. Under the LLC Act and existing precedent, the claim is direct. But even if the claim is derivative, Hassanein has standing to sue.[107]

---

[105] This section goes into greater detail than the parties on the distinction between direct and derivative claims, and it addresses *sua sponte* the relevance of Section 18-502(b) to the characterization of claims as derivative versus direct. The parties put that issue before the court, and under *Kamen*, the court "retains the independent power to identify and apply the proper construction of governing law." *Kamen*, 500 U.S. at 99.

[106] In their brief, the defendants claimed that the complaint had not pled any claim for breach, citing the magistrate judge's conclusion to that effect. *See* Dkt. 30 at 6, 11, 17, 20.

[107] The magistrate judge accepted the argument that Hassanein lacked standing to sue Eliovits. Report at *3–4.

## 1. Direct And Derivative Claims

An investor in a Delaware entity can generally bring two types of claims. One category—direct claims—encompasses causes of action to enforce rights attached to the interests in the entity that the plaintiff owns and are part of the bundle of rights comprising those interests.[108] For stockholders in a corporation, direct claims include the causes of action conferred on stockholders by specific statutory provisions of the

In addition to the bases for standing addressed above the line, Hassanein argues that he has standing as a third-party beneficiary to enforce the Contribution Requirement. He relies on *NAMA*, where this court held that an express third-party beneficiary and indirect beneficial owner of equity in an LLC could sue to enforce information rights in an LLC agreement without being required to arbitrate. *NAMA Hldgs, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 422 (Del. Ch. 2007). That decision is distinguishable for two reasons: the plaintiff there was not a party to the LLC agreement as a member, and he was made an express third-party beneficiary of the information rights in the agreement. *Id.* at 424. Neither is true for Hassanein. He is already a party to the LLC Agreement by virtue of his status as the Class B Member, and he is not an express third-party beneficiary. Recognizing third-party beneficiary status for a member like Hassanein would run contrary to the basic concept that third-party beneficiary status exists for third parties, not parties to an agreement. For an LLC, it would have the additional complication of undermining the legal framework governing the distinction between direct and derivative claims. If Hassanein otherwise lacked standing to sue, his third-party beneficiary theory would not rescue him.

[108] *See Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 677 (Del. 2020) (explaining that certain non-personal securities rights, "inhere in the security itself" and "aris[e] from the relationship among stockholder, stock and the company.'" These rights "travel[] with a stock sale" and "are more than just incidental to the ownership of stock."); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at \*7 (Del. Ch. Jan. 18, 1996) (Allen, C.) (observing that if a lawsuit "seeks a remedy to compensate for the invasion of a property right of a stockholder," then the claim is direct and "the recovery will be for the stockholder"); Garrard Glenn, *The Stockholder's Suit—Corporate and Individual Grievances*, 33 Yale L.J. 580, 592 (1924) (explaining that a suit to enforce a constitutive corporate agreement is an individual, not a derivative, claim).

DGCL.[109] Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws.[110] Stockholders similarly can sue directly to enforce contractual constraints

---

[109] *See, e.g.*, 8 *Del. C.* § 155 (right to receive fair value for fractional shares); *id.* § 168 (right to compel the issuance of a new stock certificate); *id.* § 205 (right to sue regarding the validity of a defective corporate act); *id.* § 211(c) (right to judicial enforcement of annual meeting requirement); *id.* § 212(b) (right to consent or dissent to corporate action by proxy); *id.* § 219(b) (right to compel corporate production of stock ledger); *id.* § 220(c) (right to sue to obtain books and records); *id.* § 222 (right to adequate notice of stockholder meetings); *id.* § 223(a) (right to fill vacancies and new directorships); *id.* § 225(a) (right to sue regarding the election, appointment, or removal of corporate directors and officers); *id.* § 225(b) (right to sue regarding non-electoral shareholder votes); *id.* § 225(c) (right to sue regarding the removal of officers after a felony conviction or corporate governance harm); *id.* § 226(a) (right to a judicial appointment of a custodian); *id.* § 231(c) (right to challenge ballot, proxies, or votes); *id.* § 262(a) (right to bring appraisal proceeding); *id.* § 279 (right to appointment of a receiver or trustee to wind up a dissolved corporation).

[110] *See Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010) (holding that where a charter conferred a right to payment from a trust fund on IPO shareholders, the rights to payment were "direct contract claims for which no demand [was] required."); *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *7, *13–14 (Del. Ch. May 5, 2010) (holding that plaintiff "state[d] a direct claim" because its charter-granted consent rights to compensation increases were "improperly ignored."); *Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del. Super. Feb. 21, 2011) (describing an individual claim as "wholly direct," because plaintiff's "alleged inability to vote" was "contractual and independent of any right of the corporation."); *see also Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002) (explaining that "[t]o state a direct claim" a shareholder's injury must be "different from what is suffered by other shareholders" or involve "a contractual right of shareholders that is independent of the corporation's rights."), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE). As *Tooley* specifically held, stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders possessed the same right and suffered the same injury. *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). *See generally Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1105–09 (Del. Ch. 2014) (noting that *Tooley* "confirmed the direct nature of a

on a board's authority under the charter, bylaws, and provisions of the DGCL.[111] The availability of a direct cause of action in these situations comports with Delaware's longstanding recognition that the DGCL, the certificate of incorporation, and the bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation.[112] As parties to the contract, stockholders can enforce it.[113]

A member in an LLC possesses analogous rights. The universe of direct claims starts with the causes of action granted to members by specific statutory provisions

---

stockholder's cause of action for injury to its contractual rights as a stockholder, even when a plaintiff assert[ed] the same contractual right in a representative capacity on behalf of all stockholders.").

[111] *See Grimes v. Donald*, 673 A.2d 1207, 1213 n.15 (Del. 1996); *Shaev v. Adkerson*, 2015 WL 5882942, at *3 (Del. Ch. Oct. 5, 2015); *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010).

[112] *E.g.*, 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation."); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . .").

[113] *See Grimes*, 673 A.2d at 1212; *Grayson*, 2010 WL 3221951, at *6; *see also Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del. Ch. 1988) (Allen, C.) (noting that the scope of a restriction on a fiduciary's authority is "not . . . a question that a court may leave to the [fiduciary] finally to decide so long as he does so honestly and competently; that is, it may not be left to the [fiduciary's] business judgment.").

of the LLC Act.[114] It also includes causes of action to enforce the contract rights that the members possess under the LLC's governing agreement.[115] After all, "[i]t is the policy of [the LLC Act] to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[116] Just as stockholders can sue directly to enforce contractual rights they possess under the charter or bylaws, a member can sue directly to enforce a right it possesses under an LLC agreement.

Derivative claims are another category of claims that investors in Delaware entities bring. For a Delaware LLC, the LLC Act codifies the concept of a derivative action.[117] The member's derivative action is a statutory descendant of the corporate

---

[114] *See, e.g.*, 6 *Del. C.* § 18-110(a) (right to sue regarding the validity of any admission, election, appointment or removal of an LLC manager); *id.* § 18-110(b) (right to sue regarding the result of a member or manager vote); *id.* § 18-111 (right to enforce the provisions of an LLC agreement or the obligations of its members and managers); *id.* § 18-205(b) (right to compel execution of an LLC agreement or amendment); *id.* § 18-207 (right to recover damages from a manager for false statements in a certificate). *id.* § 18-305(a) (right to information and records); *id.* § 18-601 (right to receive distributions before a manager's resignation and company dissolution); *id.* § 18-606 (right to the same remedies as a creditor with respect to distributions).

[115] *Vinton v. Grayson*, 189 A.3d 695, 701 (Del. Super. 2018) ("Here, as signatories to the [LLC Operating] Agreement, each of the Member Plaintiffs has standing to sue [the defendant Member] for his breach."); *VH5 Cap., LLC v. Rabe*, 2023 WL 4305827, at *14 (Del. Ch. June 30, 2023) ("VH5 was a member of OPL and has standing to sue for breach of the Operating Agreement.").

[116] 6 *Del. C.* § 18-1101(c); *accord Elf Atochem*, 727 A.2d at 291 (discussing the policy of freedom of contract undergirding the LLC Act).

[117] 6 *Del. C.* § 18-1001.

derivative action. "Devised as a suit in equity, the purpose of the derivative action was . . . to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"[118] The claims that nineteenth-century jurists confronted when originally recognizing the concept of the derivative action typically involved allegations of mismanagement or the misappropriation of funds from the corporate treasury.[119] Courts of equity responded by analogizing the role of a director to that of a trustee, "thus bringing the dispute within the ambit of existing and unquestioned doctrine, . . . provid[ing] a ready-made set of substantive rules to govern the directors and at the same time satisfy[ing] the requirement of a ground for equitable jurisdiction."[120]

In *Tooley*,[121] the Delaware Supreme Court set out the test for determining whether a claim is derivative or direct.

---

[118] *Kamen*, 500 U.S. at 95 (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

[119] *See* Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes On Its Derivation*, 32 N.Y.U. L. Rev. 980, 982–83, 986–89 (1957) (tracing history of derivative actions and their initial focus on recovering funds misappropriated by management); *see also* Donna I. Dennis, *Contrivance and Collusion: The Corporate Origins of Shareholder Derivative Litigation in the United States*, 67 Rutgers U. L. Rev. 1479, 1481–85 (2015) (describing origins of derivative suit).

[120] Prunty, *supra*, at 986; *see Maldonado v. Flynn*, 413 A.2d 1251, 1261 (Del. Ch. 1980) (explaining that the "initial purpose" of the derivative action "was to provide the stockholder a right to call to account his directors for their management of the corporation, analogous to the right of a trust beneficiary to call his trustee to account for the management of the trust corpus."), *rev'd on other grounds sub nom. Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

[121] *Tooley*, 845 A.2d at 1033.

We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the suing stockholders, individually)?[122]

Since *Tooley*, the Delaware Supreme Court has extended that test to LLCs.[123]

## 2. Standing

Under *Tooley*, a claim to enforce the Contribution Requirement would seem to be derivative. Viewed through *Tooley*'s injury lens, the Company suffered the injury because it did not receive money that Eliovits was obligated to contribute. Viewed through *Tooley*'s remedy lens, the natural remedy would be an order in favor of the Company enforcing the Contribution Requirement against Eliovits. Consistent with a derivative characterization, one Delaware case states in *dictum* that a claim to

---

[122] *Id.*

[123] *See In re El Paso Pipeline P'rs, L.P. Derivative Litig.*, 132 A.3d 67, 86 (Del. Ch. 2015).

enforce a capital contribution in a Delaware limited partnership is derivative,[124] and Eliovits has cited one non-Delaware case that reaches the same conclusion.[125]

But there is contrary authority. In *Vinton*, Judge Wallace held that a member could enforce another member's contribution obligation directly through an action for breach of contract,[126] and he cited a non-Delaware case to the same effect.[127]

The most persuasive authority in favor of a direct characterization is Section 18-502(b) of the LLC Act, which Hassanein invokes in Count III. That section states that "[u]nless otherwise provided in a limited liability company agreement, the obligation of a member to make a contribution … may be compromised only by

---

[124] *See Murphy v. Bay Shores Six, Ltd. P'ship*, 1987 WL 5776, at *5 (Del. Ch. Jan. 26, 1987) (Allen, C.) ("When a partner fails to make the stated contribution, he or she is obligated, at the option of the limited partnership, to contribute cash equal to the portion of the stated contribution not yet paid. 6 *Del. C.* § 17-502. If a limited partner fails to make a capital contribution that he is legally obligated to make, the entity, of course, may sue to force that payment to be made. In appropriate circumstances, the Act authorizes a derivative action by a limited partner if the general partner refuses to bring the action or if any demand to that effect would not be likely to succeed. 6 *Del. C.* §§ 17-1001. Thus, a derivative action to compel contribution is authorized under certain circumstances.").

[125] *Bennett v. Bennett*, 2019 WL 3753606, at *2 (N.C. Super. Ct. Aug. 6, 2019). Eliovits also cites non-Delaware cases in which the LLC, rather than a member, enforced a capital contribution obligation, but those cases do not rule out the possibility that a member also could enforce it. *See Park Charles Office Assocs. LLC v. Queens Manor Gardens LLC*, 2021 WL 5764502, at *6 (Md. Cir. Ct. 2021).

[126] *Vinton*, 189 A.3d at 701.

[127] *Afremov v. Jarayan*, 2012 WL 1049739, at *3 (D. Minn. Mar. 28, 2012) (holding that a member as a signatory to the LLC agreement could a enforce capital contribution obligation of another member through an action for breach of contract.).

49

consent of all the members."[128] If a claim to enforce a capital contribution were derivative, then the LLC's governing body would have authority to decide whether to

[128] 6 *Del. C.* § 18-502(b). The Delaware Limited Partnership Act (the "LP Act") contains a similar limitation. *See* 6 *Del. C.* § 17-502(b)(1). When observing in *dictum* that a claim to enforce a partner's contribution obligation was derivative, *Murphy* did not discuss that provision. The Delaware Revised Uniform Partnership Act, which governs general partnerships, does not expressly address capital commitments. But it provides generally that a partner may maintain an action against the partnership or another partner, without an accounting, to enforce the partner's rights under the partnership agreement or the act. 6 *Del. C.* § 15-405(b). An obligation to contribute capital in a partnership agreement would be something any partner could enforce under this provision, consistent with the outcome that Sections 17-502 and 18-502 call for under the LP Act and the LLC Act.

The DGCL does not contain a similar default unanimity requirement to compromise a contribution obligation, and its provisions point against any direct right to enforce the obligation. The DGCL empowers the directors to enforce a contribution obligation "as the necessities of the business may, in the judgment of the board of directors, require." 8 *Del. C.* § 163. That provision makes non-enforcement discretionary and supports board control over the obligation and a derivative characterization. The DGCL also provides that an amount due as consideration for shares that has not been paid in "may be recovered as provided in § 325 of this title, after a writ of execution against the corporation has been returned as unsatisfied as provide in said § 325." 8 *Del. C.* § 162(b). Under Section 325(a), "When the officers, directors or stockholders of any corporation shall be liable by the provisions of this chapter to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any 1 or more of them, and the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally." 8 *Del. C.* § 325(a). Under Section 325(b), "No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied." 8 *Del. C.* § 325(b). That combination of provisions suggests that a creditor could sue to enforce a contribution obligation. A stockholder, by contrast, could not, because a stockholder would not be "a person to whom they are liable." *Id.* Like the DGCL, the Delaware Statutory Trust Act makes enforcement of the obligation a matter of entity discretion. 12 *Del. C.* § 3802(b) ("If a beneficial owner does not make the required contribution of property or services, the beneficial owner is obligated at the option of the statutory trust to contribute cash

assert the claim. If demand was not excused, then that governing body could simply refuse to enforce the claim, effectively compromising it without unanimous member consent. Treating the claim as direct avoids neutering the statutory right and upholds the default requirement of unanimity for compromising a contribution claim.

Eliovits seems to argue an LLC agreement can "provide otherwise" by empowering a manager to manage the business and affairs of the LLC, thereby contracting out of the unanimity requirement in Section 18-502(b) and giving the manager the power to decide whether to assert the contribution claim.[129] But a provision authorizing a manager to manage an LLC is not sufficient to alter the unanimity requirement. Every LLC has either a manager-managed or member-managed governance structure.[130] Under either structure, some individual or group has authority over the business and affairs of the LLC. If possessing that authority were sufficient to opt out of the unanimity default, then every LLC would have opted out, and the unanimity requirement would become a nullity. Section 18-502(b) therefore must require more, such as language stating expressly, in substance, that

equal to that portion of the agreed value (as stated in the records of the statutory trust) of the contribution that has not been made.").

The different statutory approaches generate different outcomes. For general partnerships, limited partnerships, and LLCs, the claim is direct. For corporations and statutory trusts, the claim is derivative.

[129] *See* LLCA § 6.1 (creating a manager-managed governance structure, making Eliovits the sole manager, and vesting him with authority over "[t]he business, affairs, administration and management of the Company.").

[130] *See* 6 *Del. C.* § 18-402.

compromising a contribution obligation requires a different vote, such as a vote by holders of a majority of the member interests. The LLC Agreement does not contain that form of opt-out.

The default unanimity requirement in Section 18-502(b) indicates that the right to enforce a contribution requirement is a right for the benefit of every member in the LLC and that any member can therefore enforce it directly, as *Vinton* held. The implications of Section 18-502(b) override the outcome that *Tooley* otherwise would generate.

In any event, even if Count II were derivative, Hassanein can still assert it. Under the LLC Act, a member like Hassanein can assert a derivative claim on an LLC's behalf "if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed."[131] Hassanein is a member of the Company, and the complaint supports an inference that an effort to cause those managers or members to bring the action is not likely to succeed.

In *Zuckerberg,*[132] the Delaware Supreme Court established a unified test for evaluating whether an effort to cause a corporate board of directors to sue would be futile, thereby excusing demand. To date, no Delaware decision has applied the *Zuckerberg* test to an LLC, but this court applied Delaware's pre-*Zuckerberg* test for

---

[131] *Id.* § 18-1001.

[132] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

demand futility to an LLC.[133] The *Zuckerberg* standard can provide a helpful framework for conducting the inquiry contemplated by the LLC Act.

Under one aspect of the *Zuckerberg* test, a director cannot validly consider a demand if "the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand."[134] Under that aspect of the test, Eliovits cannot validly consider a demand to enforce the Contribution Requirement.

Eliovits is the sole obligor under the Contribution Requirement. If he caused the Company to enforce the Contribution Agreement against him, he would face a substantial risk of liability. An effort to cause Eliovits to bring an action to enforce the Contribution Requirement is therefore not likely to succeed.

The LLC Agreement contains an exculpatory provision, but it does not alter Eliovits's liability. Under the LLC Agreement, "no Member shall be liable, responsible, or accountable in damages . . . except for acts of gross negligence or intentional wrongdoing."[135] It is reasonably conceivable that by failing to comply with the mandatory Contribution Requirement, Eliovits engaged in intentional wrongdoing. It is also reasonably conceivable that by failing to enforce the mandatory Contribution Requirement, Eliovits engaged in intentional wrongdoing. Demand is therefore futile.

---

[133] *Portnoy*, 2008 WL 5197164, at *9–10 (applying the *Aronson* test to evaluate demand futility under the LLC Act).

[134] *Zuckerberg*, 262 A.3d at 1059.

[135] LLCA § 6.8.

As Hassanein acknowledges, he did not expressly plead Count II as a derivative claim. That, however, is not dispositive. The court is "not bound by the designation employed by the plaintiff."[136] "To determine whether a complaint states a derivative or an individual cause of action, [a court] must look to the nature of the wrongs . . . , not to the plaintiff's designation or stated intention."[137]

Moreover, Rule 23.1 does not require that a plaintiff title a particular claim as a derivative action. Rule 23.1 likewise does not require that a plaintiff include a specific section entitled demand futility. Rule 23.1 states that the complaint in a derivative action must:

(1) state with particularity:

    (A) any effort by the derivative plaintiff to obtain the desired action from the entity; and

    (B) the reasons for not obtaining the action or not making the effort; and

(2) allege facts supporting a reasonable inference that the derivative plaintiff has standing to sue derivatively under the law governing the entity.[138]

---

[136] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1069 (Del. Ch. 1985); *accord BTZ, Inc. v. Nat'l Intergroup, Inc.*, 1993 WL 133211, at *2 (Del. Ch. Apr. 7, 1993); *In re Cencom Cable Income P'rs, L.P. Litig.*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000).

[137] *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1078 (Del. 1986).

[138] Ch. Ct. R. 23.1(a).

Rule 23.1 does not require any special headings or formats. To the contrary, Rule 8(e) states that "Pleadings must be construed so as to do justice."[139]

The complaint satisfies Rule 23.1's requirements. The complaint does not state explicitly that Hassanein seeks to sue derivatively, and it does not state explicitly that Hassanein did not ask Eliovits to sue to enforce the Contribution Requirement because Eliovits would have to sue himself and face a substantial likelihood of liability. That, however, is the natural inference of the well-pled facts.

Count II states a claim on which relief can be granted. Hassanein has standing to assert that claim.

## C.    Count III: The Claim Under Section 18-502(b) Of The LLC Act

Count III seeks to enforce the Contribution Requirement directly on the theory that Hassanein is a creditor of the Company and therefore can sue Eliovits under Section 18-502 of the LLC Act. That count states a claim on which relief can be granted.[140]

Section 18-502(a) of the LLC Act states: "Except as provided in a limited liability company agreement, a member is obligated to a limited liability company to perform any promise to contribute cash or property or to perform services, even if the

---

[139] *Id*. 8(e).

[140] I do not believe this section addresses any issues *sua sponte*. Consistent with *Kamen*, with the parties having raised the issue of standing to enforce Section 18-502(b) of the LLC Act, this decision discusses *sua sponte* the corporate-law antecedents of that statutory claim. It was also difficult to follow some of the parties' arguments, so in trying to steelman them, this decision may frame them differently.

member is unable to perform because of death, disability or any other reason."[141]

Section 18-502(b) of the LLC Act states:

> Unless otherwise provided in a limited liability company agreement, the obligation of a member to make a contribution … may be compromised only by consent of all the members. Notwithstanding the compromise, a creditor of a limited liability company who extends credit, after the entering into of a limited liability company agreement or an amendment thereto which, in either case, reflects the obligation, and before the amendment thereof to reflect the compromise, may enforce the original obligation to the extent that, in extending credit, the creditor reasonably relied on the obligation of a member to make a contribution or return.[142]

Under this provision, "a creditor" of a limited liability company may enforce the obligation to contribute to the LLC.[143] That right, however, is subject to an exception: The LLC may have compromised the contribution obligation, either through a unanimous member vote or in the manner "otherwise provided in a limited liability company agreement." That exception comes subject to its own exception: The creditor can still enforce the original obligation if the creditor reasonably relied on it.

As pled, Count III falls squarely within the scope of Section 18-502(b). Hassanein is a creditor because he extended the Class B Loan to the Company. He can therefore enforce the Contribution Obligation that Eliovits inferably breached.

---

[141] 6 *Del. C.* § 18-502(a).

[142] *Id.* § 18-502(b).

[143] *CML V, LLC v. Bax*, 6 A.3d 238, 252 (Del. Ch. 2010) ("Thus, in proper circumstances, [an LLC] creditor in effect may be placed in a position similar to that of the company itself in enforcing rights against members for contributions and returns." (cleaned up)).

To defeat that claim, Eliovits advances a grab bag of arguments. Although his theories are sometimes hard to follow, they seem to fall into three groups. First, he asserts a standing argument facially contrary to Section 18-502(b). Second, he claims that Section 18-502(b) permits an LLC agreement to modify its terms, and he contends that the LLC Agreement has done that. Third, he claims that various provisions in the LLC Agreement prevented Hassanein from reasonably relying on the Contribution Agreement. At the pleading stage, none of those arguments succeed.

### 1. The No-Standing Argument

Eliovits first argues that Hassanein lacks standing to sue under Section 18-502(b). Initially, he claims that only the Company can enforce the Contribution Requirement. To the contrary, Section 18-502(b) explicitly gives a creditor like Hassanein the right to enforce a contribution obligation.

Eliovits next argues that Hassanein cannot be a creditor under the LLC Agreement because he is a member. Not so. A person can relate to an LLC in multiple capacities. Under the LLC Act, a member of an LLC who transacts with the LLC has the same rights and obligations as any non-member who transacts with the LLC.[144] Hassanein can enforce his rights as a creditor to the same extent as a non-member.

---

[144] *See* 6 *Del. C.* § 18-107 ("Except as provided in a limited liability company agreement, a member or manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume 1 or more obligations of, provide collateral for, and transact other business with, a limited liability company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a person who is not a member or manager.").

Eliovits last reprises his argument that the Class B Loan is not a loan and therefore Hassanein cannot be a creditor.[145] As this decision has explained, the Class B Loan was a loan. Hassanein is a creditor with standing to enforce Section 18-502(b).

## 2. Modification In The LLC Agreement

In his next line of defense, Eliovits contends that an LLC agreement can opt out of Section 18-502(b). Eliovits relies on the first sentence of the section, which states: "Unless otherwise provided in a limited liability company agreement, the obligation of a member to make a contribution . . . may be compromised only by consent of all the members."[146] Eliovits reads this sentence as making Section 18-502 optional.[147]

That is misguided. The first sentence of Section 18-502(b) authorizes an LLC agreement to depart from the default unanimity requirement for comprising an obligation to make a capital contribution. It thus allows an LLC agreement to provide for a lower voting standard. It does not permit an LLC agreement to opt out of Section 18-502(b).

---

[145] The magistrate judge implicitly accepted this argument. Report at *5 (rejecting claim because "[b]ased upon the Agreement, Hassanein could not reasonably rely upon return of his loan principal on the Class B Loan Maturity Date.").

[146] 6 *Del. C.* § 18-502(b).

[147] The magistrate judge accepted this argument. *See* Report at *5 ("The opening language, 'Unless otherwise provided in a limited liability company agreement,' subordinates the statute's applicability to the language of the LLC Operating Agreement.").

Section 18-502(b) reflects a protection for creditors with longstanding roots in entity law. Courts developed the predecessor to Section 18-502(b) in the nineteenth century, when judges concluded that creditors should have the equitable right to enforce a subscription agreement between the corporation and a stockholder who failed to pay par value for his stock.[148] Lenders were deemed to rely on a corporation's legal capital when extending credit, and legal capital in turn was treated as a trust fund benefiting creditors.[149] If the corporation became insolvent, then equity permitted a creditor to enforce the subscription right for the benefit of all creditors.[150] Delaware's entity statutes retain statutory provisions that replicate this protection.[151] The right of creditors to enforce capital contributions stands out as one

---

[148] *See generally* Bayless Manning with James J. Hanks, Jr., *Legal Capital* 24–26 (3d ed. 1990).

[149] *See, e.g., Handley v. Stutz,* 139 U.S. 417, 427 (1891) (describing "settled doctrine" that the capital of a corporation is a trust fund for the payment of its debts and "that the law implies a promise by the original subscribers of stock, who did not pay for it in money or other property, to pay for the same when called upon by creditors"); *Hamor v. Taylor-Rice Eng'g Co.,* 84 F. 392, 395 (C.C.D.Del.1897) ("There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the stockholders.").

[150] *See* Edwin S. Hunt, *The Trust Fund Theory and Some Substitutes For It,* 12 Yale L.J. 63, 72 (1902) ("The trust fund theory has been, perhaps, most often applied to the case where a creditor of an insolvent corporation seeks to compel a stockholder to pay a balance claimed to be due on stock for which the par value has never been paid to the corporation.").

[151] *See* 6 *Del. C.* § 15-405(b) (general partnership); 6 *Del. C.* § 17-502(b) (limited partnership); 6 *Del. C.* § 18-502(b) (LLC); 8 *Del. C.* §§ 162(b), 325 (corporations); 12 *Del. C.* § 3802 (statutory trust).

of the LLC Act's mandatory, non-waivable provisions. An LLC agreement can alter the decision rule for compromising a capital commitment, but it cannot foreclose a creditor's right to sue to enforce it.

At any rate, the LLC Agreement did not purport to override Section 18-502(b). Eliovits breached the Contribution Requirement, and Hassanein can sue as a creditor to enforce it.

### 3. The No-Reliance Argument

Eliovits last argues that Hassanein could not have relied on his obligation to make a capital contribution to the Company. That issue arises only if an LLC has compromised the capital commitment that the creditor seeks to enforce. Here, the Company has not compromised the Contribution Requirement, so reliance never becomes a consideration. In any case, the Company's governance structure makes it reasonably conceivable that Hassanein relied on the Contribution Requirement.

Although it is not necessary to analyze reliance because the Company never compromised the Contribution Requirement, it is reasonably conceivable that reliance exists. Hassanein and Eliovits were friends and business partners.[152] The Company was a newly formed special-purpose vehicle without assets or revenue. The LLC Agreement contained the Contribution Requirement, which was tied directly to the Repayment Obligation. There could be no clearer link between the two, and no source of funds other than the Contribution Requirement that could satisfy the

---

[152] *See,* Dkt. 29.

Repayment Obligation. At this stage of the case, the only possible inference is that Hassanein relied on the Contribution Requirement when extending the Class B Loan.

To suggest otherwise, Eliovits points to various provisions in the LLC Agreement. None come close.[153]

First, Eliovits cites Section 3.3 of the LLC Agreement, titled "Return of Capital Contributions." It states:

> A Member is not entitled to the return of any part of its capital contributions, to be paid interest in respect of either its capital account or its capital contributions, or to be paid the fair market value of its Units in connection with its withdrawal from the Company or otherwise. An un-repaid capital contribution is not a liability of the Company or of any other Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any other Member's capital contributions.[154]

Eliovits highlights the second sentence, which states that "[a]n un-repaid capital contribution is not a liability of the Company or of any other Member." Eliovits's capital contribution is not unrepaid; it is unpaid. This section does not render the Contribution Requirement unenforceable.

To similar effect, Eliovits relies on Section 6.8 of the LLC Agreement, titled "Members Liability." It states:

> The Members shall not be liable for any Company liabilities, obligations, expenses or losses in excess of their respective interest in the Company and their respective interest in any undistributed income, profits or Property. In addition, no Member shall be liable, responsible or

---

[153] The magistrate judge also rejected the defendants' attempt to invoke these provisions. *See* Report at *5–6. But he recommended dismissing the complaint in its entirety on other grounds. *See id.* at *7.

[154] *Id.* § 3.3.

61

accountable in damages or otherwise to any other Member or to the Company for any act or omission performed or omitted by the Member except for acts of gross negligence or intentional wrongdoing.[155]

That provision doesn't help Eliovits at all.

The first quoted sentence reinforces the Company's separate legal existence. It clarifies that a member cannot be held liable for the Company's obligations. It does not relieve members of their own obligations, such as Eliovits's obligation to meet the Contribution Requirement.

The second sentence seeks to exculpate members for damages to the Company or other members except for acts of gross negligence or intentional wrongdoing. That provision does not speak to a member's specific contractual obligations, like the Contribution Requirement. In any case, it is reasonably conceivable at this stage of the case that Eliovits engaged in intentional wrongdoing by failing to satisfy the Contribution Requirement.

Last, Eliovits relies on Section 10.5, titled "Return of Capital Contributions." That provision states: "No Member shall be liable for the return of all or any part of the capital contributions of any other Member."[156] The plain language of that provision makes clear that if a member is entitled to the return of a capital contribution, then only the Company is liable for it. The Company's liability does not

---

[155] *Id.* § 6.8.

[156] *Id.* § 10.5.

become a member's liability. Eliovits has never satisfied the Contribution Requirement, so this provision does not apply.

Because the Company never compromised the Contribution Requirement, Hassanein need not show reliance to enforce it. Regardless, he was entitled to and inferably relied on the Contribution Requirement. As a creditor of the Company, Hassanein can enforce that obligation. Count III states a claim for relief.

## IV.    CONCLUSION

Counts I, II, and III state claims on which relief can be granted. The motions to dismiss those claims are denied.